UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ARMANDO RAMIREZ,                    Case No. 3:13-cv-00025-MMD-CBC

                          Petitioner,

        v.                                      ORDER

BAKER, *et al.,*

                          Respondents.

I.      **SUMMARY**

        This represented habeas matter under 28 U.S.C. § 2254 comes before the Court

for a final decision on the remaining grounds.  For the reasons discussed below, the Court

denies the amended petition, seeking federal habeas relief.

II.     **BACKGROUND**

        **A.      Introduction**

        Petitioner Armando Ramirez seeks to set aside his 2007 Nevada state conviction,

pursuant to a jury verdict, of first-degree murder with the use of a deadly weapon and

conspiracy to commit murder. He was sentenced to consecutive sentences of life with the

possibility of parole along with a concurrent sentence of 2 to 10 years. He challenged the

conviction on direct appeal and state post-conviction review.

        As will be discussed *infra*, the remaining grounds present substantive claims

and/or ineffective-assistance claims relating to: (a) an erroneous jury instruction on

coconspirator liability to which no objection was raised at trial, (b) an incomplete jury

instruction on aider and abettor liability for the deadly weapon enhancement also as to

which no trial objection was raised; and (c) trial counsel's failure to properly preserve a request for a self-defense instruction. The state supreme court held on direct appeal, in reviewing for plain error, that Ramirez failed to establish that the two jury instruction errors affected his substantial rights. The court held on state post-conviction review that Ramirez could not demonstrate prejudice from counsel's failure to properly preserve a request for a self-defense instruction because, *inter alia*, there was not a reasonable probability that the jury would have acquitted Ramirez had the jury been instructed on self-defense. (ECF No. 21-9 at 4-8; ECF No. 22-12.)

## B. Summary of Relevant Facts

Evidence presented at trial tended to establish the following.[1]

On the morning of July 14, 2003, Brandi Robinson-Monge and her brother Robert Monge were walking to a neighborhood 7-Eleven in Las Vegas, Nevada to gamble. As they were walking, Armando "Creeper" Ramirez and Alejandro "Mouse" Manzo pulled up in a white Ford F-150 pickup truck. Robinson-Monge knew both men; and she had, "[f]or lack of a better word," "dated" Ramirez. (ECF No. 19-4 at 34-35, 46-47, 53.)

According to Robinson-Monge's testimony, Ramirez wanted to go to the nearby Eureka Casino, a small casino on East Sahara Avenue, to gamble.[2] (*Id.* at 35, 47, 54.) Monge, who was declared a hostile witness during the State's direct at trial, testified

---

[1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering Petitioner's claims.

[2]The Court has taken judicial notice of an aerial view of the immediate surrounding area on Google Maps. *See* www.google.com/maps. Such a view is consistent with, collectively, the specific location testimony provided by various witnesses in multiple references spread across the trial record. Such testimony on occasion was provided with the use of diagrams or photographs that were in the state court trial record but which are not included in the federal record. Judicial notice of the aerial view thus essentially reconstructs a vantage point before the jury that is reflected in the trial record.

initially that it was his sister's idea to go to the Eureka to gamble. However, he acknowledged that he previously had testified under oath that "the whole reason we went to the Eureka" was because "[t]hey [referring to Ramirez and Manzo] were going to meet a dude they knew that owed them some money." (ECF No. 20-3 at 9-10.)

According to Robinson-Monge's at times wavering testimony and stills from the Eureka surveillance video, Ramirez was wearing an untucked red t-shirt; Manzo and Monge both were wearing white tank tops; and Robinson-Monge was wearing a black shirt with white shorts. (ECF No. 19-4 at 35-36, 54, 60; ECF No. 20-3 at 18.)

At the Eureka, while Robinson-Monge and Monge gambled, Ramirez and Manzo interacted with Miguel "Nino" Ortega. The latter eventually told the four that he had a place where they could smoke some drugs. At this point, Robinson-Monge whispered to Ramirez that they could smoke at her apartment. She testified that Ramirez then said to her "no, because you don't know who will show up there," which she found odd because he had never been to her apartment. (ECF No. 19-4 at 36, 47-48, 54-55.)

Ortega left first for his nearby apartment on his bicycle; and Ramirez, Manzo, Robinson-Monge, and Monge followed in the F-150. On the way over, Ramirez said to someone on the phone: "I want to run him over, I'm going to run him over." Robinson-Monge testified that while Ortega had left before them on the bike, she did not see him at this point and only saw him get off the bike at the apartment. She previously had told the police that she saw Ortega on the bike when Ramirez made the statement. She testified that, on the way, Ramirez asked them to "have his back." Monge further testified that Ramirez asked them to not call him Creeper at Ortega's. (ECF No. 19-4 at 37, 61; *see also* ECF No. 20-3 at 10-11, 18.)

Ortega's apartment was at 209 Kendale Street, which was only a short distance away from the Eureka, around the corner and on the next cross street to the east off Sahara Ave. (*See* ECF No. 19-1 at 11-15; ECF No. 19-4 at 49; ECF No. 20-3 at 10, 21.)

As they arrived at the apartment, Ramirez told Robinson-Monge that there would be someone parked at the end of the street and that she was to go get in the car and get

something for him. She went down the street and got into the car, encountering a male that she knew and another female. She got back out of the car, however, without picking up anything, after she saw her brother come back outside of Ortega's apartment apparently looking for her. (ECF No. 19-4 at 37; *see also* ECF No. 20-3 at 12-13.)

When Robinson-Monge walked back up to the apartment and the nearby parked truck, she saw Manzo with a gun "like he was fixing a gun or loading a gun." She asked him what he was doing, but he did not respond. She did not believe that he spoke very much English, however, as he never said anything. (ECF No. 19-4 at 37-38, 49, 59.)

When Robinson-Monge went inside she saw someone named Ray-Ray who she believed owed her money. She testified initially on direct that when she confronted Ray-Ray over the money Ramirez told her "to cut it, to be quiet." On cross-examination, she elaborated that Ramirez said "be quiet, that's not what we're here for." (ECF No. 19-4 at 38-39, 55; *see also* ECF No. 20-3 at 13-14.)

Ray-Ray then recognized Ramirez, and he said "what's up, Creeper." When Ortega thereby discovered that Ramirez was "Creeper," a confrontation immediately ensued. The confrontation ultimately settled down. Ortega and Ramirez appeared to resolve their differences, which concerned an earlier deal for guns that had "gone bad." Ortega indicated that he was going to get the guns in question for Ramirez. Some of those present then did some lines of methamphetamine. (ECF No. 19-4 at 39-40, 42-43, 50, 55; ECF No. 20-3 at 10-12, 18-19.)

The dispute flared back up again thereafter. Ramirez, Ortega, and Manzo went out into the enclosed patio at the front entrance to the apartment, which faced out onto Kendale Street. (ECF No. 19-4 at 40-41, 55-57; ECF No. 20-3 at 14, 19.)

According to Robinson-Monge's testimony, she saw a scuffle. She then heard shots fired from off to her left side. She could not see who fired the shots; but Manzo at that time was standing to her right, not her left. Robinson-Monge got up and pushed her brother, who was standing by the patio door, out of the way. As she was moving, she heard a second set of shots coming instead then from in front of her, and she saw Manzo

firing those shots. Robinson-Monge pushed her brother out through the patio, stepping over Ortega to get out of the patio gate. She testified that she heard Ortega say "I was going to get them back for you," to which Ramirez responded: "Too fucking late." (ECF No. 19-4 at 41-42, 46, 51, 56-57.)

According to her testimony, Robinson-Monge was the first one out of the gate and then the first one back in the parked truck. Ramirez then got into the driver's seat. Ortega meanwhile was grasping at Monge's leg, and Robinson-Monge prevailed upon him to break free and get in the truck. Ramirez then pulled forward a few yards before Manzo got in, and they drove away north on Kendale St. toward Sahara Ave. (ECF No. 19-4 at 41-42, 51, 57.)

According to Robert Monge's testimony, there was a commotion after Ramirez, Ortega, and Manzo went out onto the patio. He then heard several gun shots in rapid succession, as in "bang, bang, bang," followed by a louder "boom." At that time, he saw Ramirez in his red shirt on the patio and Ortega in front of the gate, but he could not see Manzo. He did not see Ramirez, Manzo, or Ortega with a gun or reaching for a gun at any time. In prior statements to the police, however, he had said that he saw Manzo reaching in his pocket or waistband area and that he was pretty sure that Manzo had a gun. (ECF No. 20-3 at 14-17, 19-20.)

As Monge's sister was pushing him out through the patio, Ortega by then was out through the gate "laying down a little bit." Monge heard Ortega "babbling" words to the effect of "I was getting the guns." Monge, who as noted by then was a hostile witness to the State, testified at trial that Ortega told him, Monge, "don't shoot me," and that Ortega apparently thought that Monge had been shooting him. Monge previously had stated to the police, however, that Ortega instead was asking why did "they" shoot him, saying that he was getting the gun, and pleading "don't shoot me." Monge maintained at trial, however, that Ortega's questions, pleas, and comments instead were directed to and at him rather than anyone else. (ECF No. 20-3 at 14-15, 19-20, 30.)

///

Similar to his sister, Monge testified that he, Ramirez, and Robinson-Monge got into the truck with Ramirez pulling away a short distance before Manzo also got in. (ECF No. 20-3 at 15-16.)

An uninvolved witness, James Daniel Ross, provided a contrasting account of the shooting. Ross was a maintenance person for the Palms Apartments, which included two-story multi-unit buildings extending along both sides of Kendale St. (ECF No. 19-1 at 6, 9-11, 14, 39-41.)

On the morning of the shooting, Ross was on the roof of 613 Kendale, across the street from Ortega's apartment at 209 Kendale, servicing an air conditioning unit. Ross heard what he thought was a firecracker coming from the general direction of the street. He thought initially that some children were playing with firecrackers, as it was only a short time after July Fourth, so he walked over to the edge of the roof to tell the children to stop. (ECF No. 19-1 at 6-12, 39-41; ECF No. 19-2 at 4-5, 11, 17-18, 32.)

By the time that he reached the roof's edge overlooking Kendale St., however, he then heard what he knew to be gunshots. He saw an unarmed portly Hispanic male who Ross believed had been shot backing out of the gate to the front patio of 209. Although Ross could not make out what he was saying, it appeared that he was begging. (ECF No. 19-1 at 13-15, 36-39, 42-44, 50-51; ECF No. 19-2 at 5, 11, 15, 17-20, 23-24, 32-33.)[3]

Ross saw an apparently Hispanic male shooter coming through the patio gate wearing an oversized white t-shirt and firing a handgun. He was followed by another male in a white t-shirt together with a female. (ECF No. 19-1 at 13, 15, 18-21, 36-39, 44-48; ECF No. 19-2 at 6-7, 9, 16, 20.)

Ross, who had experience with guns in the military, could not be sure as to the type of gun from his vantage point; but he believed it to be a semiautomatic pistol. The

///

---

[3]Respondents assert in the supplemental answer that "Ross heard two sets of gun shots, but only saw the shooter of the second set of gun shots." (ECF No. 59 at 4.) Ross testified that he first heard what he referenced at one point as "firecrackers," but he also acceded that he heard what sounded "like one firecracker." (ECF No. 19-1 at 7, 12.) The first "set" that he heard therefore may have been only a single gunshot.

shots sounded to him to be from a 9 mm caliber gun rather than a larger round like from a .45 caliber pistol. The shots that he heard all sounded to him like they were from the same weapon. He did not see the shooter or anyone else there pick up any ejected casings, but he would not have seen any casings ejected inside the enclosed patio. (ECF No. 19-1 at 13, 16-17, 48-50; ECF No. 19-2 at 9, 12-14, 21, 24-25, 28, 32.)

Ross saw and heard the shooter fire a number of rounds at Ortega while appearing to be speaking, although Ross could not hear what he was saying. Ortega kept moving away, staggering toward 211 Kendale, while the shooter pursued, shooting him also in the back. The shooter and the two companions then got into a parked F-150 truck and drove away north toward Sahara Ave., with the shooter driving. (ECF No. 19-1 at 13-15, 18, 21-27, 32-34, 50-52; ECF No. 19-2 at 10-11, 15-16, 21-23, 27-28.)

Ross ran north on the roof trying to see the license plate, ultimately losing sight of the truck after it turned right on Sahara. Ross did not see anyone else come out of 209 before they drove off. He did not see anyone at any time wearing a red shirt. He could not see into the enclosed patio courtyard, however; and he testified that his attention was focused on the shooter and victim. (ECF No. 19-1 at 27-33, 37-38; ECF No. 19-2 at 2, 8, 10-11, 16, 20-21, 27-28, 33.)

Robinson-Monge testified that after they left the Palms Apartments onto Sahara, they drove into a neighboring commercial area. Ramirez directed that Manzo and Monge each split off separately; and he and Robinson-Monge continued on together on foot. (ECF No. 19-4 at 43, 57.)[4]

Ramirez and Robinson-Monge ran across Maryland Parkway into a shopping plaza area. Ramirez threw something in a dumpster that made a metal on metal sound as it hit the bottom. She later said to Ramirez that he threw a gun into the dumpster or garbage can. He said: "I did? Oh did I?" Robinson-Monge ultimately testified at trial—after

///

---

[4]It had been Robinson-Monge's impression that the F-150 truck was stolen. (*E.g.*, ECF No. 19-4 at 34.) The trial record is not explicit as to what the group did with the truck after they split up, but at least Ramirez and Robinson-Monge proceeded on foot.

stating at one point that she saw a gun—that she did not see a gun but she assumed that it was a gun from the sound that it made when Ramirez threw the object in the dumpster. (ECF No. 19-4 at 43, 57-58, 60; ECF No. 20 at 24-25.)

Ramirez and Robinson-Monge made their way into a nearby apartment complex. There they met up with the same male who had been in the car that Ramirez had sent Robinson-Monte to prior to going to Ortega's apartment. They rode in his car, and a female with them that Robinson-Monge had not met before gave her an I.D. that looked like her. They eventually wound up at the Longhorn Casino where they had a meal, meeting back up also with Manzo. They got a room at the Longhorn with Robinson-Monge's new fake I.D.; but Ramirez left, apparently with Manzo, a few hours later. (ECF No. 19-4 at 43-44, 52.)

A couple of days later, Ramirez hid while someone else knocked on Robinson-Monge's door; and he showed himself only after she opened the door. Once inside, he asked her whether they could talk privately. They went into the bathroom, and he turned on the water to keep others from hearing their conversation. Over the course of her testimony, she testified that Ramirez then said "I never killed anybody before," "I'm not like him," and that he "didn't feel like a man." (ECF No. 19-4 at 44-46, 52, 61.)

Elaine Gibbs testified to a conversation with Ramirez at a party at her apartment during the early morning hours of November 1, 2003. She asked Ramirez whether he had killed someone referred to as "Flaka." According to her testimony, he responded that he had not killed Flaka but that he had killed Nino, *i.e.*, Ortega. (ECF No. 20 at 25-29.)

The testimony of Brandi Robinson-Monge, Robert Monge, and Elaine Gibbs all were subject to multiple potential bases for impeachment. *Inter alia*, all three were frequent users of methamphetamine and may have been addicted. (ECF No. 19-4 at 48-49, 53, 58; ECF No. 20 at 27; ECF No. 20-3 at 20.) All three had prior convictions at the time of trial, and Robinson-Monge admitted that she lived on the "other side of the law." (ECF No. 19-4 at 47, 51-52; ECF No. 20 at 26-27; ECF No. 20-3 at 4-5.) All three further had had criminal cases pending against them recently, although all three denied having

8

made any deals with the State in exchange for their testimony. (ECF No. 19-4 at 33-34; ECF No. 20 at 26-27; ECF No. 20-3 at 5.) However, the police threatened Robinson-Monge during an early interview that they would charge her and her brother as accessories and/or as conspirators if she were not more forthcoming. (ECF No. 19-4 at 59-60.) Gibbs did not come forward with Ramirez's inculpatory statement to her until several months later, after she had been arrested and jailed on a parole violation. Gibbs had wanted to make a deal when she did so, although she did not get one. (ECF No. 20 at 26-28.) Robert Monge professed a lack of recollection at trial, and he sought to discredit his more inculpatory prior statements and testimony on the basis that he simply had been repeating what his sister had said in her statements in an effort to try and keep her out of trouble. (ECF No. 20-3 at 4-8, 10-11, 16.) Other testimony suggested, however, that he potentially was concerned for his safety; and he was in prison at the time of the trial. (ECF No. 20-3 at 26-27, 29-30; *see also* ECF No. 20-5 at 9.)

These potential bases for impeachment of their more inculpatory statements notwithstanding, the foregoing summary reflects facts that the jury could have found to be true if jurors found the witnesses' testimony or statements credible in whole or in part.

Crime scene analysts recovered three ejected casings, one from outside the patio gate to 209 Kendale and the other two from within the patio courtyard.[5] It was possible that additional casings could have remained lodged within nearby thick bushes and not been recovered, although the bushes were examined by the analysts. The three casings consisted of two .32 auto caliber casings and one .32 Smith & Wesson caliber casing. A .32 auto caliber handgun and a .32 Smith & Wesson caliber handgun each could fire both caliber rounds. All three casings had extractor marks consistent with having been ejected

///

///

---

[5]A "cartridge" refers to a single unfired round of ammunition consisting of a "bullet" or "projectile" seated into a "cartridge casing," "casing" or "case" that contains the propellant and primer. An unfired cartridge also is referred to as a "live" cartridge. On a semiautomatic gun, the empty casing is ejected from an ejection port by the mechanical action of the weapon when firing the bullet. (*See, e.g.*, ECF No. 20 at 17, 21.)

from a semiautomatic weapon, and all three had been ejected from the same specific weapon. (ECF No. 20 at 8-9, 14-15, 17.)

The autopsy reflected that Ortega sustained multiple gunshot wounds, including two entrance wounds in the back. There were no indications on the body itself that the gunshots were fired from a close range of less than two to three feet, although the clothing had been removed and was not examined for evidence of close proximity gunshots. Three bullets were recovered from Ortega's body, with two of the bullets being deformed by impact. (ECF No. 19-4 at 18-28.)

One of the three bullets recovered was a .32 caliber lead bullet that was consistent with the .32 Smith & Wesson casing. A second .32 caliber full metal jacket bullet was consistent with the two .32 auto casings. The rifling characteristics on these two bullets were consistent with having been fired from a single firearm, but not conclusively so. (ECF No. 20 at 18.)

The firearms expert referred to the third bullet initially as a "nine millimeter or .357 caliber jacketed bullet." He opined that the round, which had mushroomed on impact, most likely was a brass jacketed hollow point 9 mm Luger round of a particular make. This round could not have been fired from a weapon that fired the .32 caliber rounds. While 9 mm semiautomatic pistols were more common, 9 mm revolvers were "not uncommon." If the second weapon were a revolver, it would not have automatically ejected casings. However, most of the firearms that produced rifling marks like those on the recovered bullet were semi-automatic pistols. (ECF No. 20 at 15, 18-20.)

The .32 caliber and 9 mm weapons would sound differently at a sufficient distance when fired in a controlled environment. However, whether fired in a confined space or outside, multiple variables, including echo, could affect how the sound of a weapon or weapons was perceived by an observer. (ECF No. 20 at 21-22.)

## III.   PRINCIPLE GOVERNING STANDARD OF REVIEW

When the state courts have adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a "highly deferential" standard for

10

evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. *Id.* at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. *Id.* at 181-88.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Id.* at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g.*, *Esparza*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas

review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference to the state court factual finding:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 569.

## IV. DISCUSSION

### A. Grounds 1 and 2: Jury Instruction Error

Ramirez argues these claims together in the reply. In Grounds 1 and 2, Ramirez alleges that he was denied rights to due process and a fair trial in violation of the Fifth and Fourteenth Amendments due to erroneous jury instructions at trial. In Ground 1, he alleges that the jury was improperly instructed that a conspirator is liable for any act of a coconspirator that is a probable and natural consequence of the object of the conspiracy. In Ground 2, he alleges that the jury was improperly instructed that he could be found guilty of the weapon enhancement as an aider and abettor without also instructing the jury that he must have knowledge of the weapon and dominion and control over it by actual or constructive possession. (ECF No. 17 at 14-19.)

In its October 17, 2008, decision on direct appeal, the Supreme Court of Nevada held as follows with regard to these two claims:

> Second, Ramirez claims that the district court erred when it gave an instruction on vicarious coconspirator liability that included reference to the

"natural and probable consequences doctrine,"[FN4] an instruction that this court found erroneous in Bolden v. State.[FN5] Ramirez failed to object to this instruction at trial. Generally, the failure to object at trial precludes appellate review of an issue.[FN6] Nonetheless, this court may address an error if it was plain and affected a defendant's substantial rights.[FN7] To establish that his substantial rights were affected, the appellant bears the burden of showing that the error was prejudicial.[FN8]

> [FN4] Jury Instruction 8 advised that "[e]very conspirator is legally responsible for an act of a co-conspirator that follows as one of the probable and natural consequences of the object of the conspiracy even if it was not intended as part of the original plan and even if he was not present at the time of the commission of such act." This language is identical to the instruction that we found mandated reversal in Bolden.

> [FN5] 121 Nev. 908, 922-23, 124 P.3d 191, 200-01 (2005).

> [FN6] Gallego v. State, 117 Nev. 348, 365, 23 P.3d 227, 239 (2001).

> [FN7] Id.; NRS 178.602.

> [FN8] Gallego, 117 Nev. at 365, 23 P.3d at 239.

In Bolden, we concluded that it was error to instruct the jury on the natural and probable consequences doctrine of coconspirator liability in relation to specific intent crimes because that instruction allowed the prosecution to obtain a conviction for those crimes without proving the requisite intent.[FN9] Because Bolden was established law at the time of Ramirez's trial, it was error not to instruct the jury regarding the specific intent required to establish liability under a theory of vicarious coconspirator liability.

> [FN9] Bolden, 121 Nev. at 921, 124 P.3d at 200.

However, Ramirez must also demonstrate that the error affected his substantial rights. Here, in addition to finding Ramirez guilty of first-degree murder, the jury also convicted Ramirez of conspiracy to commit murder. The jury was correctly instructed that "[t]o be guilty of conspiracy, a defendant must intend to commit, or to aid in the commission of, the specific crime agreed to." *Accordingly, in convicting Ramirez of conspiracy to commit murder, the jury necessarily found that Ramirez possessed the specific intent to murder Ortega.* Further, the jury was instructed that "[i]f you find that . . . the defendant was a party to the conspiracy and possessed the intent to kill the victim then he is also guilty of First Degree Murder." When viewing the jury instructions as a whole and the jury's findings of guilt as to conspiracy to commit murder, we conclude that the jury would have convicted Ramirez of first-degree murder even without the erroneous

instruction. Accordingly Ramirez has failed to demonstrate that the error affected his substantial rights.

Third, Ramirez complains that the jury was erroneously instructed on aiding and abetting liability for the deadly weapon enhancement. Specifically, he argues that the jury instructions did not inform the jury that the State had to prove that he had knowledge of the firearm used and actual or constructive possession of it in order to be subject to the enhancement as an unarmed offender. Trial counsel did not object to the instruction that was given, and thus Ramirez's claim is reviewed for plain error affecting his substantial rights.[FN10]

[FN10] Browning v. State, 124 Nev. ___, ___, 188 P.3d 60, 71 (2008).

In Anderson v. State, which was the law at the time of Ramirez's trial, we held that a deadly weapon enhancement can be based on either actual or constructive possession and that constructive possession existed where an unarmed participant in a crime had both knowledge that the other offender was armed and the ability to exercise control over the firearm.[FN11] Here, jury instruction 10 read simply that "[t]he participation of a defendant not actually in possession of the weapon by aiding or abetting the actual user in the unlawful use of the weapon, makes a defendant equally subject to the added weapon enhancement available." The instruction fails to inform the jury that the unarmed participant must have had knowledge of and control over the weapon used to commit the crime in order to be subject to the deadly weapon enhancement. Accordingly, we conclude that it was error to give this instruction.

[FN11] 95 Nev. 625, 630, 600 P.2d 241, 244 (1979), abrogated by Brooks v. State, 124 Nev. ___, 180 P.3d 657 (2008).

However, Ramirez is not entitled to relief unless he can demonstrate that his substantial rights were violated. In light of the evidence presented at trial, we conclude that if the jury had been instructed on the elements of actual and constructive possession it still would have convicted Ramirez of the deadly weapon enhancement. In particular, the evidence at trial was such that the jury could have found that Ramirez and Manzo both shot the victim. The forensic evidence showed that two different firearms were used in the shooting. A witness testified that the shooter got into the driver's side of the truck, which was testified to by others as the seat occupied by Ramirez. Robinson-Monge testified that she thought Ramirez threw a gun in a dumpster shortly after the shooting, and there was testimony at trial that Ramirez later confessed to the murder.

Moreover, even if the jury did not believe that Ramirez fired a gun at the victim, it convicted him of conspiracy to commit murder. This determination indicates that it found that Ramirez had knowledge of the plan and the

weapons used to shoot Ortega. Moreover, Ramirez was present with Manzo at all relevant times, and thus had the ability to exercise control over the firearms. Thus, we conclude that the erroneous jury instruction did not affect Ramirez's substantial rights, and he is not entitled to relief.[FN12]

> [FN12] Recently, in <u>Brooks v. State</u>, 124 Nev. ___, ___, 180 P.3d 657, 661 (2008), we abrogated our holding in <u>Anderson</u> and stated that an unarmed offender is subject to a deadly weapon enhancement when (1) the unarmed offender is liable as a principal for the offense, (2) another principal is armed and uses a deadly weapon in the commission of the offense, and (3) the unarmed offender had knowledge of the use of the deadly weapon. We conclude that, based on the reasoning above, even if <u>Brooks</u> is applicable to this appeal and the jury had been correctly instructed pursuant to that case, it would have found Ramirez liable for the deadly weapon enhancement.

(ECF No. 21-9 at 4-8; emphasis added.)

The foregoing decision was neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court at the time of the state supreme court's October 17, 2008 decision on the merits.

Petitioner urges that the state supreme court's decision was contrary to Supreme Court harmless-error precedent, including in particular *Chapman v. California*, 386 U.S. 18 (1967), and *Davis v. Ayala*, 135 S. Ct. 2187 (2015). He contends that the state supreme court failed to apply the harmless-error standard required by *Chapman*. He insists in particular that the court improperly placed the burden on the defendant to show that the error was not prejudicial rather than requiring under *Chapman* that the State demonstrate that the error was harmless beyond a reasonable doubt. (ECF No. 48 at 18-22.)

Petitioner's argument is fundamentally flawed. The *Chapman* harmless-error standard applies where a timely objection was raised in the trial court and the error then is considered on a *de novo* review on direct appeal. Where a timely objection was *not* raised in the trial court, the *Chapman* harmless-error standard is inapplicable. In that circumstance, both the United States Supreme Court and the Ninth Circuit instead apply in federal criminal cases a plain-error standard of review under Federal Rule of Criminal

Procedure 52(b), which is substantially identical to the plain-error standard applied by the Nevada Supreme Court in this case. *See, e.g.*, *Jones v. United States*, 527 U.S. 373, 389-90 (1999); *United States v. Garrido*, 713 F.3d 985, 994 (9th Cir. 2013) (the panel noted that the *Chapman* harmless-error standard applied with respect to claims of constitutional jury instruction error but stated that plain-error review instead applied where there was no objection to the instruction at trial); *see also Gallego*, 23 P.3d at 239 nn. 29 & 30, *abrogated on other grounds Nunnery v. State*, 263 P.3d 235 (Nev. 2011) (the *Gallego* opinion noted the equivalence of NRS § 178.602 to Rule 52(b) and relied upon federal authorities for the applicable standard). *Chapman* thus is wholly inapposite in a case, such as the present one, where no objection was raised in the trial court to the later-challenged jury instructions.[6]

Ramirez otherwise cites no apposite United States Supreme Court precedent holding – as a matter of constitutional law – prior to October 17, 2008, that the state courts must apply one plain-error standard rather than another when no objection was raised in the trial court. Indeed, the Supreme Court instead has stated in collaterally reviewing a state court conviction that "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The Court noted that the defendant's burden in that circumstance would be "especially heavy" where the jury instruction was incomplete rather than a misstatement of the law in and of itself. *Id.* at 155.

Petitioner accordingly has failed to identify—as a threshold matter—the "clearly established federal law as determined by the United States Supreme Court" that the state

---

[6]It is incongruous to argue that the state supreme court's decision was contrary to clearly established federal law when it applied the same analysis that the Supreme Court and Ninth Circuit apply on direct review in federal criminal cases where there was no objection to a jury instruction at trial. *See also United States v. Robinson*, 485 U.S. 25, (1988) (Blackmun, J., concurring in part and dissenting in part) (the federal appellate court's opinion "threaten[ed] to render meaningless the contemporaneous-objection requirement in the context of constitutional error . . . [as] [u]nder the Court of Appeals' analysis, constitutional error, whether or not objected to at trial, always would be subject to the more sensitive prejudice standard set out in *Chapman*").

supreme court's decision allegedly either was contrary to or unreasonably applied. As noted, the *Chapman* harmless-error standard simply is inapplicable in this context where the defendant did not object to the jury instruction in the trial court. *See, e.g.*, *Garrido*, 713 F.3d at 994. And Ramirez cites no apposite Supreme Court precedent establishing that a state court must apply one standard of plain-error review rather than another on a direct appeal where no objection was raised in the trial court. Where there is no clearly established federal law stating a particular standard or rule at the time of the state court decision, then, by definition, a petitioner cannot establish under AEDPA that the state court's decision was either contrary to or an unreasonable application of clearly established federal law. *See, e.g.*, *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006); *see also Williams v. Taylor*, 529 U.S. 362, 390 (2000) ("threshold question"). Ramirez, who has the burden of both proof and persuasion on habeas review, has not demonstrated that the United States Supreme Court had established by October 17, 2008, a constitutionally-compelled plain-error standard of review that state courts must apply on direct review. He accordingly cannot establish a basis for relief on either ground under AEDPA.[7]

Petitioner would not be entitled to relief under AEDPA even if the Court were to assume for discussion that then clearly established Supreme Court precedent required the state supreme court to apply a plain-error standard of review similar to the standard applied under Rule 52(b), which is substantially identical to the standard applied by the state supreme court in this case. In this regard, a federal court's evaluation of whether a state court's application of a rule was objectively unreasonable requires consideration of the rule's specificity. The Supreme Court has stated that "[t]he more general the rule, the

---

[7]Under AEDPA, Ramirez further cannot rely upon the 2015 decision in *Davis v. Ayala* to establish that the state supreme court's October 17, 2008 decision was contrary to or an objectively unreasonable application of clearly established federal law at the time of its decision. Clearly established federal law includes only the Supreme Court's decisions at the time of the relevant state court adjudication on the merits. *E.g.*, *Greene v. Fisher*, 565 U.S. 34 (2011). Petitioner's extensive reliance upon *Ayala* therefore is misplaced. *Ayala* in any event does not establish a constitutionally required plain-error standard that must be applied by state courts on direct appeal where an objection was not raised in the trial court.

more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

The state supreme court's application of the general plain-error standard of review was not an objectively unreasonable application of that standard, if otherwise compelled by the Constitution. Given that the jury found Ramirez guilty of conspiracy to commit murder, with the accompanying specific intent to murder Ortega, the state supreme court's decision, on both grounds, was not objectively unreasonable. Petitioner maintains that other jury instructions cannot cure an erroneous instruction. However, Ninth Circuit authority applying the same plain-error standard of review also looks to the instructions as a whole in assessing whether there was a reasonable probability that an erroneous instruction affected the outcome at trial. *Garrido*, 713 F.3d at 995. Moreover, the state supreme court's decision rested on "the jury instructions as a whole *and the jury's findings of guilt as to conspiracy to commit murder.*" (ECF No. 21-9 at 6 (emphasis added).)

Nor is the Court persuaded by Ramirez's argument that the instructions permitted the jury to find him guilty of conspiracy to commit murder without the specific intent that a murder be committed. Instruction No. 4 stated, *inter alia*: "To be guilty of conspiracy, a defendant must intend to commit, or to aid in the commission of, the specific crime agreed to." (ECF No. 20-6 at 5.) Petitioner urges that under the instruction "[o]ne is guilty of conspiracy simply if one aided in the commission of a murder." (ECF No. 48 at 21.) The instruction instead states that the defendant must *intend to commit*, *or to aid in the commission of*," in this instance, murder. The Court cannot discern how one would *intend* specifically to aid in the commission of a murder but not harbor the specific intent that the murder be committed. Guilt is predicated under the jury charge upon *intent*, not merely upon an act that somehow "simply aided" in the commission of a murder. The Nevada Supreme Court, the final arbiter of the Nevada law reflected by the jury charge, read the charge in the same manner.

Petitioner's argument challenging the state supreme court's analysis further is premised upon an incomplete, often inaccurate, and argumentative description of the trial

18

evidence. (*See* ECF No. 48 at 5-12.)[8] The Court has independently reviewed the complete trial record; and, against that backdrop, the state supreme court's application of the plain-error review standard to the trial record was not objectively unreasonable. *See supra* Section II. To be sure, there were multiple bases upon which to *seek* to challenge the credibility of inculpatory testimony and/or prior statements by the State's percipient witnesses. However, it remained within the jury's province to find their accounts credible, in whole or in part. Given that the jury found that Ramirez was guilty of conspiracy to commit murder, it was not objectively unreasonable to conclude that Petitioner could not

---

[8]*Inter alia*, on points both large and small, which also bear on the accuracy and reliability of the recital: (1) there was no testimony in the cited portion of the trial record that Brandi Robinson-Monge and her brother initially were walking on Swenson Avenue [sic]; (2) while Robert Monge sought to distance himself at trial from prior statements and testimony inculpating Ramirez, it was up to the jury to determine whether his prior statements and testimony were more credible; (3) Ramirez omits Robinson-Monge's testimony that Ramirez also said "that's not what we're here for" when she confronted Ray-Ray (ECF No. 19-4 at 55 (Exhibit 11 at 206)); (4) while Ortega had numerous tattoos, there is no testimony in the cited portions of the trial record identifying the tattoos as Mexican Mafia tattoos; (5) while all of the gunshots sounded the same to James Daniel Ross, Monge heard different-sounding gunshots; and the firearms expert testified that multiple variables could affect how the sound of gunshots were perceived by an observer; (6) Ramirez omits Robinson-Monge's testimony that, at her apartment two days after the shooting, Ramirez also stated "I never killed anybody before" (*id.* at 61 (Exhibit 11 at 229)); (7) Ramirez's assertions that Robinson-Monge was a pathological liar and that her perception was "muddled" after having done a line of methamphetamine are pejorative argument, not evidence (*see* ECF No. 19-4 at 58 (Exhibit 11 at 219-20)); (8) Petitioner's assertion that Ross "could not accurately see what was happening" because he was looking down from two stories high and across a residential street from the shooting does not fairly characterize his testimony, which was clear and specific as to what he could and could not see from that distance; and, indeed, Ramirez argued in closing instead that Ross had "the perfect vantage point" (ECF No. 20-5 at 18 (Exhibit 18 at 63)); and (9) Petitioner's assertion that Ramirez relied on the affirmative defense of self-defense as well as a lesser included offense of voluntary manslaughter is belied by the trial record, as Ramirez made no such arguments in closing argument, even after the prosecutor clearly stated in her initial closing argument that Ramirez was not relying on self-defense (ECF No. 20-5 at 4, 10, 13-21 (Exhibit 18 at 5, 31-32, 44-73)).

Petitioner also refers to the "Nevada Supreme Court's . . . at least in part, . . . clearly erroneous belief that trial counsel did not preserve the instruction error issues." (ECF No. 48, at 7-8.) The record before the state supreme court on direct appeal established, clearly and indisputably, that Ramirez did *not* object on the record at trial to Jury Instruction Nos. 8 and 10, which are the instructions in question in Grounds 1 and 2. (ECF No. 20-3, at 32-35.)

demonstrate prejudice from the jury instruction errors challenged in Grounds 1 and 2, for substantially the reasons outlined by the state supreme court in its decision.

The most salient point remains, however, that the *Chapman* harmless-error standard that Ramirez urges that the state court should have applied did not apply on the direct appeal in this case because no objection to the challenged jury instructions was made at trial. Ramirez otherwise has not identified any apposite Supreme Court precedent requiring in the first instance that the state supreme court apply a different plain-error standard than it did where no objection was raised at trial.

To the extent that application of the collateral-review harmless-error standard in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), otherwise is required in this context, the Court concludes that Petitioner has not demonstrated actual prejudice under that standard, for substantially the reasons relied upon by the state supreme court on plain-error review. There was evidence from which a jury could find that Ramirez, Manzo, and potentially others preplanned and conspired together to meet up with Ortega and murder him. Given that the jury found Ramirez guilty of a conspiracy to murder Ortega, Petitioner cannot establish actual prejudice, on the evidence presented at trial, from the jury instruction errors challenged in Grounds 1 and 2, either with regard to the intent required for first-degree murder or a requirement that Ramirez have knowledge of and at least constructive control over the two different weapons used in the murder. In this vein, the Court notes that the State never argued for a finding of guilt on any state of mind less than a specific intent to kill Ortega. (*See* ECF No. 20-5 at 4-7, 11, 22-24; *cf. Garrido*, 713 F.3d at 995 ("We may also examine the arguments made by the parties," when conducting plain-error review).)

Grounds 1 and 2 therefore do not provide a basis for federal habeas relief.

**B.      Ground 4(a): Effective Assistance – Coconspirator Liability Instruction**

In Ground 4 of the first amended petition, Ramirez alleges that he was denied effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments when defense counsel failed to preserve the jury-instruction error issues that are the

20

subject of Grounds 1, 2, and 3 herein.[9] (ECF No. 17 at 23-24.) The Court previously subdivided Ground 4 into subgrounds 4(a), 4(b), and 4(c). (ECF No. 28 at 6.)

In Ground 4(a), Ramirez alleges that he was denied effective assistance when trial counsel failed to object to the erroneous vicarious coconspirator liability instruction given at trial. The erroneous instruction stated in pertinent part that a conspirator is liable for any act of a coconspirator that is a probable and natural consequence of the object of the conspiracy. The prior discussion of the trial evidence and of the related substantive claim presented in Ground 1 provide background also for this claim. *See supra* Sections II and IV(A).

Under the state and federal procedural history in this case, Ground 4(a) is technically exhausted by procedural default, subject only to the question of whether Ramirez can overcome the procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012).[10] The principal issues before the Court on Ground 4(a) therefore, in context,[11] are: (1) whether Ground 4(a) is a substantial claim of ineffective assistance of trial counsel; (2) if so, whether state postconviction counsel was ineffective in failing to raise Ground 4(a) in the state district court; and (3) if so, whether, on the merits, Ramirez was denied effective assistance of counsel by trial counsel's failure to challenge the coconspirator instruction. *See, e.g.*, *Atwood v. Ryan*, 870 F.3d 1033, 1059-60 & nn. 21-22 (9th Cir. 2017). On all such issues, if reached, the Court's review is *de novo*. *See, e.g.*, ///

---

[9]As discussed further *infra* regarding a denial of a certificate of appealability, the Court previously held that Ground 3 is unexhausted.

[10](*See* ECF Nos. 50, 52, 53.)

[11]It has not been disputed herein that (1) a state post-conviction proceeding in the state district court is an initial-review collateral proceeding for purposes of *Martinez*, and (2) Nevada procedural law sufficiently requires an inmate to present a claim of ineffective assistance of trial counsel for the first time in that proceeding for purposes of applying the *Martinez* rule. The Court therefore does not dwell further over these additional contextual background requirements under *Martinez*. *See generally Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir. 2019) (full statement of background procedural default law and the *Martinez* requirements, as applied in the Nevada context).

*Detrich v. Ryan*, 740 F.3d 1237, 1246-48 (9th Cir. 2013) (*en banc*); *Atwood*, 870 F.3d at 1060 n.22.

On the first issue, a claim is "substantial" under *Martinez* if it has "some merit," with the Supreme Court referring to the standards for issuance of a certificate of appealability ("COA"). 566 U.S. at 14. Under those standards, a petitioner must make a "substantial showing of the denial of a constitutional right" as to which reasonable jurists could debate essentially the proper disposition of the constitutional claim, such that the issue presented is "adequate to deserve encouragement to proceed further." *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). This standard does not require a showing that the claim will succeed, only that its proper disposition could be debated among reasonable jurists. *Id.* at 337-38.[12]

On the second issue, the Court must determine whether state postconviction counsel provided ineffective assistance in the district court postconviction proceedings, under the standard for constitutional claims of ineffective assistance of counsel established in *Strickland v. Washington*, 466 U.S. 668 (1984). In this context, the petitioner must show both that postconviction counsel's performance was deficient and that the petitioner sustained prejudice because there was a reasonable probability of a different outcome in the postconviction proceeding absent the deficient performance. *See*

_____

[12]Under Ninth Circuit precedent, the question of whether a claim is "substantial" under *Martinez* serves as the "prejudice" component of the standard cause-and-prejudice analysis for overcoming a procedural default. *E.g.*, *Atwood*, 870 F.3d at 1059 n.21; *see generally Murray v. Carrier*, 477 U.S. 478, 485-86 (1986) (cause-and-prejudice standard generally). However, the COA standard that the Supreme Court borrowed from that context to determine whether a claim is "substantial" under *Martinez* constitutes a threshold-inquiry standard in both nature and function. It therefore arguably is more efficient and logical to consider the issue of whether a claim is "substantial" under *Martinez* essentially as a threshold issue before considering definitively whether postconviction counsel was ineffective for failing to raise the claim. Both "cause" and "prejudice" must be demonstrated to overcome a procedural default. *E.g.*, *Murray*, 477 U.S. at 494. Nothing in the cause-and-prejudice analysis inherently precludes a court from considering "prejudice" prior to "cause" when applying *Martinez*. (The question of whether postconviction counsel was ineffective under the *Strickland* standard serves as the "cause" component of the standard cause-and-prejudice analysis when applying *Martinez*. *See Atwood*, 870 F.3d at 1059 n.21.)

*Rodney v. Filson*, 916 F.3d 1254, 1260 & n.2 (9th Cir. 2019). However, the mere fact that postconviction counsel raised other claims of ineffective assistance of trial counsel in the state district court does not preclude a showing that postconviction counsel was ineffective. Rather, a procedural default can be overcome under *Martinez* even if postconviction counsel did raise some claims of ineffective assistance of trial counsel. *See Detrich*, 740 F.3d at 1248.[13]

The second issue and the third issue, *i.e.*, the merits of the claim of ineffective assistance of trial counsel, thus substantially overlap:

> In evaluating whether the failure to raise a substantial claim of ineffective assistance of trial counsel in state court resulted from ineffective assistance of *state habeas counsel* under *Strickland*, we must evaluate the strength of the prisoner's underlying ineffective assistance of *trial* counsel claim. If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised. *Clabourne*, 745 F.3d at 377 ("The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective.").

*Atwood*, 870 F.3d at 1059-60 (emphasis in original; footnote omitted).

In the present case, Ground 4(a) is a substantial claim of ineffective assistance of trial counsel for purposes of *Martinez*. As discussed further below, trial counsel's failure to object to the erroneous jury instruction clearly constituted deficient performance. The question of whether Ramirez sustained resulting prejudice to satisfy the *Strickland*

---

[13]Ramirez suggests that the standard for determining ineffective assistance of postconviction counsel is likely less stringent than the *Strickland* standard because *Martinez* held that the underlying ineffective-assistance claim must have only "some merit." (ECF No. 74 at 2 n.3.) Ramirez confuses the standard for determining whether an underlying ineffective-assistance claim is "substantial" with the standard for determining whether postconviction counsel was ineffective. The issues represent two distinct inquiries governed by two distinct standards. Under the Ninth Circuit precedent cited in the text, the *Strickland* standard clearly governs the determination of whether postconviction counsel was ineffective.

standard further can be debated by reasonable jurists on the record presented, even if Ramirez ultimately does not prevail on that issue. Ground 4(a) therefore is a substantial claim.

Turning to the *Strickland* analysis, which governs the interrelated questions of whether postconviction and trial counsel were ineffective, it is clear that trial counsel provided deficient performance. The instruction given at Ramirez's early 2007 trial was legally erroneous under the state supreme court's 2005 *Bolden* decision. *See supra* Section IV(A). There was no conceivable, valid, strategic reason for not objecting to a legally erroneous vicarious coconspirator liability instruction, and Respondents do not advance any.[14] The *Strickland* standard is highly deferential even on *de novo* review, and courts must apply a strong presumption that counsel's representation fell within the wide range of reasonable professional assistance. *E.g.*, *Harrington v. Richter*, 562 U.S. 86, 104-05 (2011). Moreover, under *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690. However, courts do not apply presumptions, even strong ones, blindly without regard to the record before them. *Cf. Richter*, 562 U.S. at 109 (courts may not indulge in *post hoc* rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions). The Court simply cannot imagine any conceivable strategic reason for not objecting to a legally erroneous vicarious coconspirator liability instruction. Trial counsel's failure to object to the erroneous jury instruction clearly constituted deficient performance under *Strickland*.

The Court is not persuaded, however, that Ramirez can demonstrate the requisite prejudice under *Strickland* on the underlying ineffective-assistance claim. The Court is not persuaded that Ramirez can demonstrate a reasonable probability of a different

///

///

---

[14]Respondents do not have the burden of proof or persuasion on this issue, but it is notable that Respondents argue only the prejudice issue under *Strickland* as to this claim. (ECF No. 59 at 9:22-23.)

outcome either at trial or on appeal, even allowing for the State's burden on the harmless-error issue under *Chapman* on a direct appeal.

On the *Strickland* prejudice issue, it is helpful to contrast the situation presented in the state supreme court's *Bolden* case with the situation presented instead in this case.

In *Bolden*, the defendant was convicted of conspiracy to commit "robbery and/or kidnapping" along with multiple charges based upon robbery, home invasion, burglary, and kidnapping. 124 P.3d at 192-93. The robbery and home invasion charges were general-intent crimes. *Id.* at 201. The burglary and kidnapping charges were specific-intent crimes. *Id.* Significantly, the state supreme court held in the first instance that there was sufficient evidence that Bolden was guilty of conspiracy to commit robbery and/or kidnapping based upon his direct participation in the *robbery*. *Id.* at 194.[15] As noted previously, the state supreme court further held that the vicarious coconspirator liability instruction was legally erroneous. The court held that the error required the reversal of the nonconspiracy specific-intent crimes only, because it could not be determined whether the jury's verdict on those charges was based on the legally defective vicarious coconspirator liability alternative rather than direct participation and/or aiding and abetting alternatives. *Id.* at 201-02.

///

_____

[15]The *Bolden* court stated specifically:

Here, the evidence presented at trial established that Bolden and his cohorts forcibly entered the Rascon apartment armed with switchblades, box cutters or other sharp objects and *robbed* the occupants. *Some* of the men moved two of the victims around in the residence for purposes that were both incidental and not incidental to the robberies themselves. The State presented overwhelming circumstantial and direct evidence that *Bolden* participated in the joint enterprise *to acquire drugs and money*; that he entered into an agreement to *rob* the Rascon family; that he was not merely a spectator in the Rascon apartment, as he claims; and that when the police arrived, Bolden was found hiding under a mattress. To the extent that Bolden contends that the evidence fails to support his participation in the conspiracy, his contention is without merit. The State presented more than sufficient evidence to support Bolden's conviction for conspiracy to commit robbery and/or kidnapping.

124 P.3d at 194 (emphasis added).

In the present case, in contrast, Ramirez was not convicted of conspiracy based on evidence that he conspired to commit one crime, such as robbery, while being convicted also of different crimes, such as burglary and kidnapping, which were specific-intent crimes. Rather, he was convicted of conspiring to commit murder and of committing that murder. It is clear that the jury in Ramirez's case found that he had the specific intent to commit murder because the jury found that he conspired to commit that murder.[16] It thus is clear—clear beyond a reasonable doubt—that the jury found Ramirez guilty of first-degree murder because he had the requisite intent rather than based upon a legally-deficient vicarious coconspirator liability alternative.

On the evidence in this case, only three men were in the enclosed patio when the shooting started—Ramirez, Manzo, and the victim Ortega. Robinson-Monge heard gunshots coming from her left at a time when Manzo was not firing, and she later saw Manzo firing his gun. Ortega was shot by two different guns. No forensic evidence from any gun other than those two was recovered from the scene; and Ortega never was observed by any witness shooting a gun, having a gun, or even making any motion like he had a gun. *See supra* Section II. On the trial evidence, the jury clearly found—clearly beyond a reasonable doubt on review—that Ramirez was one of two shooters that shot Ortega, that he conspired to commit the murder, and that he committed first-degree murder with the use of a deadly weapon with the requisite specific intent.[17]

---

[16]The Court previously rejected Ramirez's argument that the conspiracy instructions in his case allowed the jury to find him guilty of conspiracy to commit murder without having the specific intent required to commit murder. *See supra* Section IV(A).

[17]As discussed previously, Ramirez's arguments regarding the trial evidence are premised upon numerous inaccuracies, both large and small. *See supra* foonote 9. Any speculation that Manzo was firing two weapons akimbo both is not supported by any of the trial evidence and is contradicted by the available evidence. No shooter was ever observed by any witness firing two weapons, much less firing a weapon also from a direction opposite to where he then was standing.

In the supplemental reply directed to the Ground 4 claims, Ramirez posits, *inter alia*, that Robinson-Monge's testimony regarding Ramirez's statement "I want to run him over, I'm going to run him over" was not inculpatory because she "did not see [Ortega]

Ramirez therefore cannot establish a reasonable probability of a different outcome at trial had the jury been properly instructed on vicarious coconspirator liability following a timely objection. *Accord Holden v. State*, No. 61362, 2014 WL 2069644, at *2 (Nev. May 13, 2014) (unpublished) (petitioner could not establish a reasonable probability of a different outcome at trial had counsel objected to the coconspirator liability instruction because "he was found guilty of conspiracy to commit murder which means that the jury necessarily found that he intended to commit murder").

///

///

---

and did not even know he was on a bike." (ECF No. 74 at 5 n.4.) Ramirez overstates the record. Robinson-Monge testified that she saw Ortega leave before them on the bike— so she did know that Ortega was on the bike—although she testified that she did not see Ortega at the time that Ramirez made the statement. However, she previously had told the police that she saw Ortega on the bike in front of them when Ramirez made the statement. (ECF No. 19-4 at 37, 61.) Resolution of such a discrepancy between a witness's trial testimony and their prior inconsistent statement is a matter reserved to the jury. The jury clearly could draw an inculpatory inference from the statement within the context of the trial evidence.

Ramirez further posits that "[t]he State elides the fact that Ross saw only Monge [sic] at the shooting and was unable to identify Ramirez as a shooter," citing to *his state court appellate brief*, not the trial record. (ECF No. 74 at 5 n.4.) In truth, at his out-of-jurisdiction deposition, Ross never "identified" anyone, including Manzo, or "failed to identify" anyone, including Ramirez, as the shooter that he saw. Ross in fact testified that he told the police that he "really couldn't identify the shooter because [he] didn't get a good look at him," and he testified that he would have "no clue" as to whether any particular person was the shooter that he saw. (ECF No. 19-1 at 46-47.) Petitioner likely posits that Ross "saw only [Manzo]" because he recalled that the shooter was wearing an oversized white t-shirt and he never saw anyone wearing a red t-shirt, which was what Ramirez was wearing at least before his physical fight with Ortega. *See supra* Section II. But Ross also observed the shooter that he saw drive the truck away from the scene, and Robinson-Monge and Monge both testified that it was Ramirez who drove the truck away. *Id.* The resolution of such discrepancies within and between witnesses' testimony is a matter reserved to the jury. Moreover, Ross did not observe what transpired inside the enclosed patio and/or when he first heard the gunfire before walking over to the edge of the roof where he could see. *See id.*

Petitioner asserts that "[a]t worst, Ramirez intended to collect a debt from" Ortega. (ECF No. 74 at 6.) This assertion ignores the evidence to the contrary in the trial record that the Court has referenced herein.

Nor can Ramirez establish a reasonable probability of a different outcome on direct appeal had trial counsel properly preserved the issue for appeal.[18] Given the conviction for conspiracy to commit murder and the trial evidence, the State would have been able to satisfy the *Chapman* harmless-error standard on a properly-preserved objection to the jury instruction.[19]

Ramirez cannot establish prejudice under *Strickland* on a claim of ineffective assistance of trial counsel. He therefore does not have a viable claim of ineffective assistance of trial counsel, and he thus cannot establish ineffective assistance of postconviction counsel.

On a *de* novo review, the Court holds that Ground 4(a) is procedurally defaulted; and the Court rejects the claim also on the merits in the alternative.

Ground 4(a) accordingly does not provide a basis for federal habeas relief.[20]

---

[18]The application of a different standard of review on appeal is not the same thing as a different *outcome* on appeal.

[19]*Bolden* applied an "absolute certainty" standard to the harmless-error issue that would have required more of the State than the *Chapman* standard. *See* 124 P.3d at 201-02. Ramirez does not premise his arguments on this more rigorous standard rather than the *Chapman* standard. (*See, e.g.*, ECF No. 74 at 4.) Less than two weeks after the order of affirmance in Ramirez's case, the Nevada Supreme Court receded from this particular aspect of *Bolden* and held that the *Chapman* standard instead applied. *See Cortinas v. State*, 195 P.3d 315 (2008). There is not a reasonable probability that the state supreme court would have applied the more rigorous harmless-error standard on Ramirez's appeal with the issue then pending before it in *Cortinas,* especially if the court considered the difference in the harmless-error standard to be outcome determinative on Ramirez's appeal. Ramirez apparently implicitly concedes as much.

[20]Ramirez suggests—in the supplemental reply filed after the deadline initially had expired—that he is entitled to a hearing on the *Martinez* issues and that the "*Martinez* hearing" will address the claims of ineffective assistance of counsel in Ground 4. (ECF No. 74 at 3.)

There is no basis for an evidentiary hearing or other further proceedings on Ground 4(a). The only possible factual issue referenced by Ramirez concerns trial counsel's possible reasons for failing to object to the improper instruction. (*Id.* at 4.) On that issue, however, the Court has agreed with Ramirez that there is no conceivable strategic reason for failing to object to the erroneous instruction. Moreover, even if the Court had disagreed with Ramirez on that point, he nonetheless must show both deficient performance and resulting prejudice under *Strickland*. There is no conceivable factual issue for an

28

**C.      Ground 4(b): Effective Assistance – Weapon Enhancement Instruction**

In Ground 4(b), Ramirez alleges that he was denied effective assistance of counsel when trial counsel failed to object to the incomplete instruction given at trial regarding the weapon enhancement. The jury was instructed that Ramirez could be found guilty of the weapon enhancement as an aider and abettor without also instructing the jury that he

/// _____

evidentiary hearing on the prejudice prong in this case, as that issue turns solely upon the state court trial record. Given that the Court has held that Ramirez cannot establish *Strickland* prejudice on that record, there is no basis for an evidentiary hearing or other proceedings prior to a final and definitive resolution of Ground 4(a).

Nothing in *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (*en banc*), upon which Ramirez relies, is to the contrary. *Dickens* involved potentially hearing-worthy factual issues. *See id.* at 1317. The *en banc* court's discussion was directed to whether an evidentiary hearing was categorically precluded rather than to whether a hearing was categorically required in all cases. *See id.* at 1321-22. The *en banc* court clearly did not hold that a "*Martinez* hearing" must be held simply for the sake of holding a hearing where there are no factual issues that necessarily must be resolved. *See, e.g.*, *id.* at 1321 ("a district court may take evidence *to the extent necessary* to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*") (emphasis added).

To the extent that Ramirez unilaterally deferred a more extensive discussion of the issues in Ground 4 until a "*Martinez* hearing," he thus did so in error. Nothing in the Court's order for supplemental pleadings suggested that the Court was seeking filings in this six-year-old habeas case only to defer to more extensive briefing in a later proceeding. (ECF No. 53.) Ramirez has had a full and fair opportunity to address all claims and issues in Ground 4.

The Court's holdings that Ground 4(a) is a substantial claim for purposes of *Martinez* and that the ground is COA-worthy do not lead to a conclusion that the State would not have been able to establish on direct appeal that the *Bolden* error was harmless beyond a reasonable doubt. A claim—including one involving an issue as to whether the State would have been able to satisfy the *Chapman* standard—can be debatable among reasonable jurists even though every such jurist, following review on a full record, might reject the claim. *See Miller-El*, 537 U.S. at 337-38 ("We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."). That is, a conclusion as an initial threshold matter that a claim is "substantial" or that a COA should issue does not *ipso facto* demonstrate that—on a full consideration of the merits and record—the State would not have been able to establish on a direct appeal that an instructional error was harmless beyond a reasonable doubt under *Chapman*.

must have knowledge of the weapon and dominion and control over it by actual or constructive possession. The prior discussion of the trial evidence and of the related substantive claim presented in Ground 2 provide background also for this claim. *See supra* Section II and IV(A).

Ground 4(b), like Ground 4(a), is technically exhausted by procedural default, subject only to the question of whether Ramirez can overcome the procedural default under *Martinez*. The Court's outline of the principal issues and governing law for the analysis under *Martinez* as to Ground 4(a) applies also to Ground 4(b). *See supra* Section IV(B).

Ground 4(b) also is a substantial claim of ineffective assistance of trial counsel for purposes of *Martinez*. As discussed further below, trial counsel's failure to object to the incomplete jury instruction clearly constituted deficient performance. The question of whether Ramirez sustained resulting prejudice to satisfy the *Strickland* standard further can be debated by reasonable jurists on the record presented, even if Ramirez ultimately does not prevail on that issue. Ground 4(b) therefore is a substantial claim.

Turning to the *Strickland* analysis, which governs the interrelated questions of whether postconviction and trial counsel were ineffective, trial counsel clearly provided deficient performance. The instruction given was incomplete, and there was no conceivable valid strategic reason for not objecting to the instruction and seeking a full and correct statement of the law. Trial counsel's performance therefore was deficient.

The Court is not persuaded, however, that Ramirez can demonstrate the requisite prejudice under *Strickland* on the underlying ineffective-assistance claim. The Court is not persuaded that Ramirez can demonstrate a reasonable probability of a different outcome either at trial or on appeal, even allowing for the State's burden on the harmless-error issue under *Chapman* on a direct appeal.

Neither Robinson-Monge nor her brother testified to seeing Ramirez firing a gun either inside or outside the enclosed patio, and Ross was not able to positively identify the shooter that he saw outside the patio as any specific individual. The evidence that

Ramirez fired a gun nonetheless was strong. As discussed regarding Ground 4(a), only three men were in the enclosed patio when the shooting started—Ramirez, Manzo, and the victim Ortega. Robinson-Monge heard gunshots coming from her left at a time when Manzo was not firing, and she later saw Manzo firing his gun. Ortega was shot by two different guns. No forensic evidence from any gun other than those two was recovered from the scene; and Ortega never was observed by any witness shooting a gun, having a gun, or even making any motion like he had a gun. (ECF No. 19-4 at 41; ECF No. 20-3 at 16; *see supra* Section II.) If (a) there were only the three men on the patio—Ramirez, Manzo, and Ortega, (b) there were two different shooters on the patio, with Ortega ultimately being hit by two different guns, and (c) Ortega was not a shooter, then fairly simple math supports a strong inference that Ramirez fired the second gun that shot Ortega. Such a strong inference was further supported by evidence that Ramirez tossed a metal object that the witness perceived to be a gun into a dumpster a short time after the murder, as well as Ramirez's apparently rhetorical response immediately thereafter and his multiple later clearly inculpatory statements. *See supra* Section II.[21]

Moreover, over and above the strong evidence that Ramirez himself fired the second gun, the jury found Ramirez guilty of conspiracy to commit Ortega's murder, a murder at which he was physically present when the object of the conspiracy was consummated. It is clear—clear beyond a reasonable doubt—that a jury having found Ramirez guilty of conspiracy to commit a murder for which he also was present would find that he accordingly had knowledge of and dominion and control by at least constructive possession over the means used to accomplish that murder.

///

///

---

[21]As discussed previously, Ramirez's arguments regarding the trial evidence are premised upon numerous inaccuracies. *See supra* notes 9 and 18. As also noted previously, any speculation that Manzo was firing two weapons akimbo both is not supported by any of the trial evidence and is contradicted by the available evidence. No shooter was ever observed by any witness firing two weapons, much less firing a weapon also from a direction opposite to where he then was standing.

Ramirez suggests, in discussing the state supreme court decision, that reliance on the conspiracy conviction to find harmless error as to the weapon-enhancement instruction is logically flawed:

> Further, the Nevada Supreme Court decision is inconsistent. The Court found the trial court gave an instruction that impermissibly expanded the scope of *conspiracy liability*. The Court found that error harmless. (See Ex. 31, at 4-5.) Later, when determining the deadly weapon enhancement instruction also impermissibly inflated the conduct of conviction, the court also found that error harmless because the jury found Ramirez guilty of conspiracy to commit murder. (See id. at 6.)

(ECF No. 74 at 6 (emphasis added).)

It instead is Ramirez's logic that is flawed, because he proceeds from a fundamentally flawed premise. The state supreme court did not find any error as to any jury instruction setting forth the standards for determining whether he was guilty of *conspiracy to commit murder*.[22] The state supreme court instead found error in the vicarious coconspirator liability instruction, which sets forth an alternative basis for culpability for the *nonconspiracy* charge, the murder, not the conspiracy charge. There is nothing inconsistent, circular, or logically flawed in a reviewing court considering the jury's finding of guilt on the conspiracy charge in determining whether an incomplete instruction on a different issue constituted harmless error.

Ramirez therefore cannot establish a reasonable probability of a different outcome at trial had the jury been fully instructed regarding the weapon enhancement. Nor can he establish a reasonable probability of a different outcome on appeal had trial counsel properly preserved the issue for appeal. Given the conviction for conspiracy to commit murder and the trial evidence, the State would have been able to satisfy the *Chapman* harmless-error standard on a properly-preserved objection to the jury instruction.

///

///

---

[22] And as discussed previously, both the Nevada Supreme Court and this Court indeed have rejected Ramirez's arguments challenging the jury instructions setting forth the standards for the conspiracy offense itself. *See supra* Section IV(A).

Ramirez cannot establish prejudice under *Strickland* on a claim of ineffective assistance of trial counsel. He therefore does not have a viable claim of ineffective assistance of trial counsel, and he thus cannot establish ineffective assistance of postconviction counsel.

On a *de* novo review, the Court holds that Ground 4(b) is procedurally defaulted; and the Court rejects the claim also on the merits in the alternative.

Ground 4(b) therefore does not provide a basis for federal habeas relief. *See also supra* note 21.

### D.    Ground 4(c): Effective Assistance – Self-Defense

In a prior order, the Court held that the only portion of Ground 4 that was actually exhausted is a claim that Ramirez was denied effective assistance of counsel when counsel failed to preserve an objection to the state district court's rejection of a self-defense instruction. The Court designated the actually exhausted portion of Ground 4 as Ground 4(c). (ECF No. 28 at 6.)

The Court's prior summary of the trial evidence serves as backdrop also to this claim. *See supra* Section II. The Court provides additional detail below specifically with regard to this claim.[23]

Defense counsel stated during Ramirez's opening statement, *inter alia*, that the jury would be instructed on self-defense and that the jury would have to decide whether the State had proven that it was not self-defense. (ECF No. 19-4 at 14.)

As noted in the earlier recital of the evidence, a confrontation ensued after Ortega inadvertently learned that Ramirez was "Creeper." As Petitioner emphasizes, Ortega was a big man at 270 pounds on a 5'11" frame. Ortega ripped off his own shirt, "bucked up," and got in Ramirez' face. According to Monge, when Manzo and Monge stepped up to ///

---

[23]The background recital on this claim serves as backdrop also to the reasons assigned *infra* in denying Ramirez's request for a certificate of appealability as to a prior holding that Ground 3 is unexhausted. The recital focuses, in context, in particular also on the record and arguments presented to the state supreme court on both appeals.

"have Ramirez' back," Ortega said that he would "kick both of their asses." (ECF No. 19-4 at 39-41, 49-50, 55; ECF No. 20-3 at 11-12, 17-20.)

While that episode may have had a bearing on Ramirez's later state of mind, no person shot, or by their actions apparently felt compelled to shoot, Ortega at that time. Nor was there any evidence that Ortega either displayed a gun, made a motion like he had a gun, or otherwise said or implied that he had a gun—at that time or at any other point during the entire incident. (*E.g.*, ECF No. 19-4 at 41; ECF No. 20-3 at 16.)

The confrontation instead settled down, and at least some of those present did some methamphetamine. (ECF No. 19-4 at 42-43, 50, 55; ECF No. 20-3 at 12.)

Robinson-Monge provided the only testimony regarding the level of physical confrontation out on the patio after the confrontation flared back up again. She testified that "Nino and Creeper were like grabbing on each other, and one would hit the fence and the other one would hit the fence like this [demonstrating]." While the two men clearly were fighting, it was more of a wrestling match than a fist fight. Robinson-Monge testified that her brother turned around to look at her, and "then I heard some shots fired." (ECF No. 19-4 at 41, 56.) Robinson-Monge's testimony did not necessarily reflect that either fighter was about to kill or inflict great bodily injury on the other, as they wrestled with one another and each in turn hit the fence. Nor did her testimony reflect either that the physical fight escalated beyond that point before the shots were fired or that Ortega gained an upper hand where he was in a position to kill or inflict great bodily injury on Ramirez. Nor, again, was there any evidence that Ortega displayed a gun or made a motion like he had a gun—at this point or any other.

According to the testimony of uninvolved witness James Daniel Ross, the unarmed Ortega was gunned down outside the patio, backing up and pleading for his life, with Ortega being shot also in the back as he tried to get away. *See supra* Section II. Consistent with Ross's testimony, the autopsy reflected, *inter alia*, that multiple gunshots hit Ortega from behind. (ECF No. 19-4 at 20-25, 28.)

///

34

Near the end of the trial, a jury charge conference was held in chambers off the record. (*See* ECF No. 20 at 29-30.) The jury instructions thereafter were settled on the record to provide counsel an opportunity to preserve any objections to the charges. On the record, Ramirez's counsel raised a number of objections and proposed a number of alternate instructions. Counsel did not, however, request a self-defense instruction on the record. Nor did counsel object on the record to the denial of any off-record request for a self-defense instruction. (ECF No. 20-3 at 32-35.)

In the State's initial closing argument, the prosecutor stated that the jury had not been instructed on self-defense "because that is not a defense that they are asking for." (ECF No. 20-5 at 4, 10.)

Ramirez's counsel thereafter did not argue self-defense. Counsel instead argued that Ramirez had not been involved in the shooting, either as a shooter, coconspirator, or aider and abettor. (ECF No. 20-5 at 13-21.)

On direct appeal, Ramirez raised, *inter alia*, an issue as to "[w]hether the district court failed to instruct the jury that it was the State's burden to prove that Ramirez did not act in self-defense or the heat of passion." (ECF No. 21-5 at 7, 24-28.) Ramirez contended that it was "plain error" for the trial court to fail to instruct the jury that it was the State's burden to prove that Ramirez did not act in self-defense. (*Id.* at 24, 27-28.) Ramirez thereby invoked a standard of review that was applicable in the absence of a properly preserved trial objection. He did not maintain that trial counsel either requested a self-defense instruction on the record or objected to the absence of such an instruction on the record.

The State's answering brief specifically argued, *inter alia*, that "because Defendant neither objected to these instructions nor requested that any additional heat of passion or self-defense instructions be given, Defendant's claims should not be considered on appeal." (ECF No. 21-6 at 29.)

Ramirez did not contend in response in his reply brief that trial counsel, on the record, had requested a self-defense instruction or objected to the failure to give one. He

again invoked a plain-error standard of review applicable to an issue that had not been properly preserved in the trial court. (*See* ECF No. 21-7 at 13-14.)

The Supreme Court of Nevada rejected the claim presented to that court on direct appeal on the following basis:

> Fourth, Ramirez asserts that the district court erred in failing to instruct the jury that the State had the burden to prove that he did not act in self-defense or in the heat of passion. In Crawford v. State, upon which Ramirez relies, we stated that a defendant is entitled to an instruction on the State's burden to prove the absence of heat of passion.[FN13] We also reaffirmed our prior decision in Runion v. State, approving a similar instruction on the State's burden to prove the absence of self-defense.[FN14] However, we stated that such instructions should be provided "upon request."[FN15] Ramirez did not request such instructions. Therefore, he has no basis for appeal,[FN16] and we conclude that he is not entitled to relief.
>
> > [FN13] Crawford v. State, 121 Nev. 744, 754, 121 P.3d 582, 589 (2005).
> >
> > [FN14] Id. at 753, 121 P.3d at 588 (quoting Runion v. State, 116 Nev. 1041, 1052, 13 P.3d 52, 59 (2000)).
> >
> > [FN15] Id. at 754, 121 P.3d at 589.
> >
> > [FN16] Etcheverry v. State, 107 Nev. 782, 784-85, 821 P.2d 350, 351 (1991).

(ECF No. 21-9 at 8-9.)

On state post-conviction review, Ramirez, through counsel, alleged, *inter alia*, that he was denied effective assistance of counsel because trial counsel failed to submit any jury instructions regarding self-defense. (ECF No. 22-1 at 4, 8, 12-15.)

At the state court evidentiary hearing, defense counsel David Shieck testified that it was his best recollection that he had requested self-defense instructions during the off-the-record jury charge conference in chambers. However, consistent with the trial transcript, he testified that he neither requested self-defense instructions nor objected to the failure to give self-defense instructions when the jury instructions were settled on the record. (ECF No. 22-3 at 7, 11.) One of the prosecutors from the trial also represented the State at the evidentiary hearing. She substantially concurred that it was her

recollection as well that defense counsel had requested self-defense instructions during the off-the-record jury charge conference. (*Id.* at 10.)

Defense co-counsel Clark Patrick testified that he also believed that the defense proffered self-defense instructions during the off-the-record jury charge conference. Patrick testified that, in part because self-defense instructions were not given, he and Shieck concluded that the best course during closing argument "was to point out that the State had not proven their case that he had a gun, or he had fired, rather than put the gun in his hand from our perspective by claiming self-defense." (ECF No. 22-3 at 13-14.)

The state district court found that "[t]rial counsel proposed jury instructions on self-defense, but the Court rejected such instructions due to the lack of evidence of self defense." The court concluded that "[c]ounsel's failure to record his objection to the Court's rejection of the self defense jury instructions was not ineffective because the evidence of Ramirez's guilt was overwhelming, and therefore, the outcome of trial and appeal would not have been different." (ECF No. 22-7 at 4-5.)

On the post-conviction appeal, Ramirez argued that he was denied effective assistance of counsel because trial counsel failed to properly preserve the defense objection to the rejection of the proposed self-defense jury instruction. Ramirez referred extensively to the hearing testimony regarding the request for the instructions during the off-the-record conference. However, he made no argument that the request for the instructions during the off-the-record conference had preserved the issue for appeal without an on-the-record request and/or objection. He instead argued that counsel had been ineffective for failing to preserve the objection on the record. (ECF No. 22-10.)

The Supreme Court of Nevada rejected the claim presented to that court on the following basis:

> Ramirez argues that the district court erred by denying his claim that trial counsel was ineffective for failing to preserve an objection to the court's rejection of self-defense jury instructions. When reviewing the district court's resolution of an ineffective-assistance claim, we give deference to the court's factual findings if supported by substantial evidence and not clearly

erroneous, but review the court's application of the law to those facts de novo. Lader v. Warden, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005). Here, after holding an evidentiary hearing, the district court found that Ramirez could not show that he was prejudiced in light of the overwhelming evidence of guilt. We conclude that Ramirez has failed to demonstrate that the district court erred in denying his claim. Ramirez did not provide this court with trial transcripts, which hinders our ability to assess the district court's determinations regarding whether counsel was ineffective. See Thomas v. State, 120 Nev. 37, 43 & n. 4, 83 P.3d 818, 822 & n. 4 (2004) (appellant is ultimately responsible for providing this court with portions of the record necessary to resolve his claims on appeal); Greene v. State, 96 Nev. 555, 558, 612 P.2d 686, 688 (1980) ("The burden to make a proper appellate record rests on appellant."); see also Means v. State, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004) ("[A] habeas corpus petitioner must prove the disputed factual allegations underlying his ineffective-assistance claim by a preponderance of the evidence.").

Nevertheless, based on a review of the incomplete record before us, we conclude that Ramirez was not prejudiced by his counsel's failure to preserve an objection to the district court's rejection of self-defense instructions. See Means, 120 Nev. at 1011, 103 P.3d at 32 (explaining the two-part test for ineffective-assistance claims under Strickland v. Washington, 466 U.S. 668, 687 (1984)). The jury found Ramirez guilty of first-degree murder, despite being presented with two less serious alternative offenses (second-degree murder and voluntary manslaughter). Thus, there is no reasonable probability that the jury would have acquitted Ramirez had the jury been instructed on self-defense. See Strickland, 466 U.S. at 694–95. Accordingly, Ramirez could not show that the outcome of his trial or direct appeal would have been different but for counsel's errors.

(ECF No. 22-12 at 2-3.)

The state supreme court's rejection of this claim was neither contrary to nor an objectively unreasonable application of clearly established federal law.

On a claim of ineffective assistance of counsel, a petitioner must satisfy Strickland's two-pronged test. He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. *E.g.*, *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

The state supreme court's decision was not an objectively unreasonable application in particular of *Strickland*'s prejudice prong.

With regard to the impact of counsel's failure on the outcome at trial, as the state supreme court noted, the jury found Petitioner guilty of first-degree murder, which required findings that the killing of Ortega was willful, deliberate, and premeditated. The jury did so against the backdrop of trial evidence that could support a finding that Ramirez sought out the encounter with Ortega while he and Manzo were armed and further with Ramirez reflecting a desire to run over Ortega with the truck during the drive over to his apartment. *See supra* Section II.[24] Moreover, while there was evidence of a heated confrontation inside the apartment, Ortega was not shot during that confrontation. Nor was there any evidence in the trial record that the circumstances of the subsequent physical fight out on the patio would give rise to an objectively reasonable belief that there was an imminent danger that Ortega was about to kill Ramirez or cause him great bodily injury. The only testimony as to that altercation reflected that the two men had grabbed each other and that one and then the other would hit the patio fence as they wrestled. *See supra* Section IV(D). Nothing in that evenhanded give-and-take would tend to reflect that one, or the other, was about to be killed or seriously injured. Finally, there was evidence that Ortega was gunned down outside the patio, backing up and pleading for his life, with Ortega being shot also in the back as he tried to get away, all in a situation

---

[24] *Cf. Runion*, 13 P.3d at 59 ("The right of self-defense is not available to an original aggressor, that is a person who has sought a quarrel with the design to force a deadly issue and thus through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault.").

While the state supreme court was not provided with a copy of the trial transcript on the state post-conviction appeal, current Ninth Circuit law is clear that the record that must be considered on federal habeas review, while applying deferential review under AEDPA, consists of all material in the lower court record, even if not actually in the appeal record. *See McDaniels v. Kirkland*, 813 F.3d 770, 780-81 (9th Cir. 2015) (*en banc*); *Jamerson v. Runnels*, 713 F.3d 1218, 1226-27 (9th Cir. 2013).

where the evidence did not reflect that Ortega was armed or had made any motion indicating that he was armed. *See supra* Section II and IV(D). Such is not the sort of evidence that typically prevents the prosecution from overcoming a plea of self-defense. The state supreme court's conclusion that there was not a reasonable probability that making an on-record request or objection with regard to self-defense instructions would have altered the outcome at trial therefore was not objectively unreasonable.

Regarding the outcome on direct appeal, Ramirez relied in the state courts on the ineffective-assistance claim on Nevada case law holding that "[g]enerally, the defense has the right to have the jury instructed on a theory of the case as disclosed by the evidence, no matter how weak or incredible that evidence may be." *See, e.g., Runion*, 13 P.3d at 58 (in the context of self-defense). That does not signify, however, that a self-defense instruction is available simply for the asking under Nevada law. The state supreme court has affirmed the rejection of a request for a self-defense instruction in numerous cases, in particular where the evidence reflected that the defendant was an aggressor or pursuer who sought out the encounter and/or there was no evidence that the defendant had reason to fear imminent death or great bodily injury. *See, e.g., Coddington v. State*, No. 71835, 2018 WL 1129659, at *4 (Nev. Feb. 26, 2018) (unpublished); *Campos v. State*, No. 72687, 2017 WL 6811843, at *2 (Nev. Dec. 29, 2017) (unpublished) (battery); *Riddle v. State*, 613 P.2d 1031, 1033 (Nev. 1980); *Mirin v. State*, 560 P.2d 145, 146 (Nev. 1977); *Williams v. State*, 539 P.2d 461, 462 (Nev. 1975). The Supreme Court of Nevada is the final arbiter of Nevada state law, and its implicit conclusion that a preserved request or objection would not have led to a different outcome under state law on direct appeal is conclusive on that issue. Against the backdrop of the evidence in the case, the conclusion further otherwise was not an objectively unreasonable application of *Strickland's* prejudice prong.

In his supplemental reply on federal habeas review, Ramirez urges that: (1) the state supreme court made an erroneous finding of fact on direct appeal that trial counsel did not request a self-defense instruction; (2) counsel did request such an instruction in

chambers but "the trial court" neglected to put this fact on the record; (3) the prosecutor from the trial corroborated defense counsel's testimony that counsel had requested a self-defense instruction in chambers; and (4) on the state postconviction appeal, the state supreme court "did not confront the fact that its direct appeal ruling was unequivocally based on a false finding of fact." (ECF No. 74 at 2 n.1.) Ramirez's argument that the state supreme court made an erroneous finding of fact is wrong.

Nevada state law is clear that "while potential jury instructions can be discussed off the record preliminarily, the instructions must be settled *on the record* with each party given the opportunity to state its objection to any instruction *and explain any requested instruction.*" *Daniel v. State*, 78 P.3d 890, 897 (Nev. 2003) (emphasis added). In the absence of objection to or request for an instruction *on the record*, appellate consideration of the issue is precluded. *Id.*; *see also Walker v. State*, 6 P.3d 477, 479 (Nev. 2000). An off-the-record request for the instruction in chambers that is not pursued further thereafter when the charges are settled on the record thus has *no effect* under Nevada state law, under settled precedent.

It is beyond any dispute that trial counsel did not request a self-defense instruction *on the record* or memorialize that request *on the record* when the jury charges were settled. *See supra* Section IV(D). The *trial court* was under absolutely no duty under Nevada state law to memorialize for the record requests made by defense counsel during the conference in chambers. Under Nevada state law, that duty fell squarely on defense counsel. Pejoratively stating that the "trial court simply neglected to put this fact on the record" thus has no significance under the controlling Nevada state law. Similarly, defense counsel's later testimony as to what he requested in chambers, but not on the record, including even if corroborated by a prosecutor's recollection, also has no significance under the controlling state law. Under clearly established Nevada state law, the request is not preserved if it is not made—by defense counsel—on the record.

The state supreme court thus made no erroneous factual finding on direct appeal when it found that the defense had failed to preserve the issue for appellate review. As a

41

1  matter of record fact, it is indisputable that defense counsel made no request for a self-

2  defense instruction *on the record*. As a matter of established Nevada law, defense

3  counsel's failure to request the instruction *on the record* failed to preserve the issue for

4  appellate review.[25]

5      The state supreme court made no erroneous factual finding on direct appeal in this

6  regard. That court therefore did not fail to confront such an error on the postconviction

7  appeal. There is thus no plausible argument that the state supreme court's decision

8  denying Ground 4(c) on the merits was based upon an unreasonable determination of

9  fact.

10      Ground 4(c) does not provide a basis for relief.[26]

---

11      [25]That is why the argument that Ramirez seeks to make on federal review—that
12  the issue was properly preserved in the trial court—was not made during two prior rounds
    of state court review, first on the substantive claim and then on the ineffective-assistance
13  claim. *See supra* Section IV(D). The argument that Ramirez now seeks to make on federal
    habeas review was not made in state court because the relevant Nevada state law—on
14  the controlling state law issue as to how to preserve a jury instruction objection and/or
    request—wholly undercuts the argument. Ramirez's argument is wrong and
15  fundamentally flawed under Nevada law.
16
      [26]Ramirez otherwise presented no argument in the supplemental reply related to
17  Ground 4(c). Ramirez failed to present further factual or legal argument in this case
    related to Ground 4(c) despite two opportunities to do so.
18
      In the original reply, Ramirez unilaterally reserved a purported "right" to brief the
19  claims in Ground 4 only after this Court's holding that Ground 3 is unexhausted is
    reversed on appeal. (ECF No. 48 at 23.) In its order directing supplemental pleadings on
20  Grounds 4(a) and 4(b), the Court noted that: (1) piecemeal appeals are strongly
    disfavored in federal practice, per the authorities cited in the order; (2) Ramirez had not
21  sought relief under either Rule 54(b) or 28 U.S.C. § 1292(b) with regard to an adjudication
    of less than all of the claims presented, and the Court would not have been inclined to
22  grant such relief if timely sought; (3) a habeas petitioner could not unilaterally secure
    piecemeal adjudication of a case by embedding a declaration to that effect in a reply; (4)
23  Ramirez's suggestion that Ground 4(c) could not be litigated separately from Ground 3
    was belied by the state court record where the ineffective-assistance claim was litigated
24  during the state postconviction proceedings through to a decision by the state supreme
    court; and (5) a prior dismissal of a related claim hardly was an unusual circumstance in
25  habeas litigation. The Court expressly rejected the represented petitioner's unilateral
    attempt to litigate the case piecemeal, and the Court afforded him a second opportunity
26  to address Ground 4(c) in the supplemental reply directed to Grounds 4(a) and 4(b). (ECF
    No. 53 at 1-3.)
27
28

# V.    CONSIDERATON OF A CERTIFICATE OF APPEALABILITY

Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c), a petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999). To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484.

As to claims rejected previously in the case on procedural grounds, the petitioner must show: (1) that jurists of reason would find it debatable whether the petition stated a valid claim of a denial of a constitutional right; and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* at 484. While both such showings must be made to obtain a COA, "a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." *Id.* at 485. Where a plain procedural bar is properly invoked, an appeal is not warranted. *Id.* at 484.

The Court grants a COA as to Grounds 4(a) and 4(b) and denies a COA as to all remaining claims, for the reasons outlined below.

///

------------------------

Ramirez again did not address Ground 4(c) in the supplemental reply other than the indirectly related argument referenced in the text. (*See* ECF No. 74.) Ramirez's supplemental reply in primarily seeks a "*Martinez* hearing." Such a procedure of course has nothing to do with Ground 4(c), which was denied on the merits in state court.

Ramirez thus has had a full and fair opportunity, twice, to present argument on Ground 4(c). The opportunity for Ramirez to address Ground 4(c) further on the merits has come, and gone, in this case.

### A.    Grounds 1 and 2

In Ground 1, Ramirez alleges that the jury was improperly instructed that a conspirator is liable for any act of a coconspirator that is the probable and natural consequences of the object of the conspiracy. In Ground 2, he alleges that the jury was improperly instructed that he could be found guilty of the weapon enhancement as an aider and abettor without also instructing the jury that he must have knowledge of the weapon and dominion and control over it by actual or constructive possession. (ECF No. 17 at 14-19.)

Ramirez did not object to the instructions at trial. On plain error review, the state supreme court held that the instructions given were erroneous but that Ramirez could not demonstrate actual prejudice. On federal habeas review, Ramirez urges that the state supreme court's decision was contrary to the *Chapman* harmless-error standard. This argument is fundamentally flawed. Neither the Supreme Court nor the Ninth Circuit apply the *Chapman* standard on plain error review where no timely objection was raised at trial. Ramirez further cites no Supreme Court precedent mandating that the state courts must apply a particular harmless-error standard on plain-error review. Even if the Court were to assume that the standard applied by the state court in this case was required under clearly established federal law, the state court's application of that standard to the facts of this case was not objectively unreasonable. The errors further were harmless under the *Brecht* standard. Reasonable jurists therefore would not find this Court's rejection of these grounds on the merits to be debatable or wrong. *See supra* Section IV(A).

Grounds 1 and 2 are related to and provide background to the COA-worthy claims in Grounds 4(a) and 4(b). Grounds 1 and 2, however, clearly are not COA-worthy claims.

### B.    Lack of Exhaustion as to Ground 3

In Ground 3, Ramirez alleges that he was denied rights to a fair trial, due process, and accurate jury instructions in violation of the Fifth and Fourteenth Amendments when the trial court failed to instruct the jury that it was the State's burden to prove Ramirez did not act in self-defense or under the heat of passion. (ECF No. 17 at 20-23.)

44

The Court held that Ground 3 was unexhausted as alleged because Ramirez sought to fundamentally alter and substantially strengthen the claim presented to the state courts. (ECF No. 28 at 4-5.)

A claim has not been fairly presented in state court if new factual allegations either fundamentally alter the legal claim already considered by the state courts or places the claim in a significantly different and stronger evidentiary posture than it was when the state courts considered it. *Dickins v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (*en banc*). In state court, Ramirez never claimed that he properly preserved a request or objection to the state district court's failure to give the above instruction. He did not do so when he presented a substantive claim on direct appeal. *See supra* Section IV(D). He did not do so when he presented a related claim of ineffective assistance of trial counsel to the state supreme court on state post-conviction review. *Id.* In federal Ground 3, however, Ramirez alleges that the state supreme court incorrectly held that he did not properly request the instruction. (ECF No. 17 at 20-23.)[27] This allegation fundamentally alters the legal claim presented to the state courts and further seeks to place the claim in a significantly different and stronger evidentiary posture than when it was considered by the state supreme court, where it was conceded that no proper request or objection was made. The claim in federal Ground 3 thus is unexhausted.[28]

Ramirez urges that even if federal Ground 3 is unexhausted, the Court improperly rejected his invocation of a purported "anticipatory default" doctrine. (ECF No. 30 at 2-4.) Ramirez maintained that Ground 3 is technically exhausted by procedural default, but he

---

[27]Ramirez's argument as to where and how he maintained in Ground 3 that the state supreme court had erred in this regard all beg the question. (ECF No. 30 at 4-9.) Ramirez clearly alleges in Ground 3 that the state supreme court's decision should be set aside because he allegedly in fact properly preserved the request and objection in the trial court, directly contrary to his presentation to the state supreme court on direct appeal and state post-conviction review. (*See* ECF No. 17 at 20:13-22, 22:23-27.)

[28]Ramirez's related claim of ineffective assistance of trial counsel on state post-conviction review otherwise did not exhaust the substantive claim in Ground 3. *See, e.g.*, *Rose v. Palmateer*, 395 F.3d 1108, 1111-13 (9th Cir. 2005).

further maintained that he should be allowed to demonstrate cause and prejudice in federal court to overcome that procedural default. (ECF No. 26 at 5-9.)

Ramirez's argument is fundamentally flawed given the substantial congruence between Nevada state and federal standards for overcoming a procedural default of a substantive claim.[29] It is likely that state procedural bars would have been *raised* if Ramirez had returned to exhaust Ground 3 rather than dismissing it. Whether they would have actually *barred* the claims, however, would have turned upon whether Ramirez could successfully argue a basis for overcoming the procedural bars under essentially the same standards that he would have relied upon in federal court. Ramirez's reliance upon *Russell v. Rolfs*, 893 F.2d 1033 (9th Cir. 1990), thus is misplaced. There is nothing improper or incongruous in Respondents arguing in a Nevada case that a claim is unexhausted while knowing that potential procedural bars likely will be raised in the state court to the claims. *See, e.g.*, *Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1988), *overruled on other grounds as recognized in Apelt v. Ryan*, 878 F.3d 800, 827 (9th Cir. 2017). Respondents of course do not know what arguments Petitioner would raise to seek to overcome the possible procedural bars, and Respondents do not know how the state courts would rule on those arguments. A claim thus is technically exhausted by procedural default only if "it is clear that the state court would *hold* the claim procedurally barred."

///

---

[29]Under state practice, "[a] petitioner can overcome the bar to an untimely or successive petition by showing good cause and prejudice." *E.g.*, *Mitchell v. State*, 149 P.3d 33, 36 (Nev. 2006). In *Robinson v. Ignacio*, 360 F.3d 1044 (9th Cir. 2004), the court of appeals recognized that "Nevada's 'cause and prejudice' analysis and the federal 'cause and prejudice analysis' are nearly identical, as both require 'cause for the default and actual prejudice as a result.'" *Id.* at 1052 n.3. Moreover, the Nevada state courts also recognize the same exception for a fundamental miscarriage of justice, such that "[e]ven when a petitioner cannot show good cause sufficient to overcome the bars to an untimely or successive petition, habeas relief may still be granted if the petitioner can demonstrate that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Mitchell*, 149 P.3d at 36 (*quoting Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

Nevada courts do not recognize the rule in *Martinez*, as a basis for overcoming state procedural defaults for claims of ineffective assistance of trial counsel. Ground 3, however, is a substantive claim, not an ineffective-assistance claim.

*Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002) (emphasis added; prior case citations and quotation marks omitted).

It is incongruous, however, for a petitioner to argue that a claim is technically exhausted by procedural default because a claim purportedly would be procedurally barred in the state courts while at the same time maintaining that the procedural default can be overcome in federal court under essentially the same standards that the state courts apply. A petitioner cannot have it both ways as to a substantive claim in a federal habeas case arising out of Nevada. Absent an unequivocal concession that a petitioner cannot overcome the procedural default under essentially the same standards, the claim is unexhausted and only possibly procedurally defaulted. *Accord Jones v. McDaniel*, No. 08-15458, 2009 WL 890915, at **1 (9th Cir. April 2, 2009). Otherwise, under an anticipatory default doctrine as envisioned by Ramirez, the stay procedure recognized by the Supreme Court in *Rhines v. Weber*, 544 U.S. 269 (2005), would be largely superfluous.[30]

Jurists of reason therefore would not find the Court's holding that Ground 3 is unexhausted to be either debatable or incorrect.[31]

_____

[30]The Court recently addressed the anticipatory default argument presented in this case more extensively, with discussion of related case law, in *Rodriguez v. Filson*, No. 3:15-cv-00339-MMD-WGC, 2017 WL 6762466, at *4-6 (D. Nev. Dec. 29, 2017), and *Myers v. Filson*, No. 3:14-cv-00082-MMD-VPC, 2017 WL 5559954, at *2-4 (D. Nev. Nov. 17, 2017).

At bottom, the argument is fundamentally flawed in this context. The argument seeks to bypass the state courts on unexhausted substantive claims and present argument instead to the federal court in an effort to overcome the procedural default, despite the congruity in the applicable standards in state and federal court. If a petitioner has a potentially viable basis for overcoming the state procedural bar under those congruent standards, then the claim is not technically exhausted by procedural default, because the claim still might not be barred by the state courts. If he does not have a potentially viable argument under those congruent standards, then the claim is technically exhausted but then is subject to immediate dismissal with prejudice as procedurally defaulted. Petitioner, again, cannot have it both ways in light of the congruent state and federal standards for overcoming procedural bars to substantive claims.

[31]As discussed in the text, Ramirez attempted to alter and strengthen Ground 3 on federal habeas review by urging for the first time that trial counsel properly preserved a

47

### C.    Ground 4(c)

In Ground 4(c), Ramirez alleges that he was denied effective assistance of counsel when trial counsel failed to preserve an objection to the state district court's rejection of a self-defense instruction. Reasonable jurists would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of the claim under *Strickland*'s prejudice prong withstands deferential review under AEDPA. *Inter alia*, the jury found Ramirez guilty of first-degree murder, which involved a finding that the killing was willful, deliberate, and premeditated. Further, although there was a back-and-forth fight between Ramirez and the victim Ortega, there was no evidence that would give rise to an objectively reasonable belief that there was an imminent danger that Ortega was about to kill Ramirez or cause him great bodily injury. Given the conviction for first-degree murder and the trial evidence, the state supreme court's determination that there was not a reasonable likelihood of a different outcome at trial was not an objectively unreasonable application of *Strickland*. *See supra* Section IV(D). The state supreme court's further implicit determination, against the backdrop of Nevada state procedural law and the trial evidence, that a properly preserved objection would not have led to a different outcome on direct appeal also was not an objectively unreasonable application of *Strickland. See*

///

---

request for the instruction in the trial court, which renders Ground 3 unexhausted. However, if the Court were to reach the merits of Ground 3, that claim, as pursued in federal court, also is fundamentally flawed. As discussed previously herein, Nevada state law clearly requires that the request must be presented *on the record* to be preserved for appellate review; and it is clear that defense counsel did not present the request on the record. *See supra* SectionVI(D). Nevada state procedural law therefore wholly undercuts the altered and purportedly strengthened claim presented on federal habeas review. Against that backdrop, the state supreme court's rejection of the claim that Ramirez instead actually presented to that court on direct appeal was neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court. As discussed with regard to Grounds 1 and 2, the *Chapman* harmless error standard is inapplicable to situations where a jury instruction issue was not preserved in the trial court. Nor has Petitioner identified any Supreme Court precedent requiring that a state appellate court consider a jury instruction issue that was not properly preserved in the trial court. Ramirez thus further cannot demonstrate, under the first *Slack* prong, that jurists of reason would find it debatable whether Ground 3 stated a valid claim of a denial of a constitutional right.

*id.* Ramirez further suggests that the state supreme court erroneously found that defense counsel did not properly preserve the request for the self-defense instruction, but Ramirez simply is wrong in this regard under established Nevada state procedural law. *See id.* Finally, Ramirez clearly received a full and fair opportunity to address Ground 4(c) in this Court. *See supra* note 28.

The Court notes that Ground 4(c) is distinguished from Grounds 4(a) and 4(b) by the fact that Ground 4(c) was rejected by the state supreme court on the merits and thus is subject to deferential review under AEDPA rather than *de novo* review. This distinction factors into a determination of whether the Court's disposition of the claims is debatable and thus as to whether the respective grounds are COA-worthy.

## VI. CONCLUSION

It is therefore ordered that the Petition, as amended, is denied: (1) on the merits as to Grounds 1, 2 and 4(c); and (2) on the basis of procedural default and in the alternative on the merits as to Grounds 4(a) and 4(b).

It is further ordered that a certificate of appealability is granted as to the rejection of Grounds 4(a) and 4(b) and is denied as to all other claims.

The Clerk of Court will enter final judgment accordingly and close this case.

DATED THIS 26th day of August 2019.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE